UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JANNETTE RAMOS,

                    Petitioner,

v.                                      Case No. 3:15-cv-904-J-34PDB

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

                    Respondents.

_____

## ORDER

### I. Status

Petitioner Jannette Ramos, an inmate of the Florida penal system, initiated this action on July 13, 2015, by filing a pro se Petition for Writ of Habeas Corpus (Petition; Doc. 1) under 28 U.S.C. § 2254. In the Petition, Ramos challenges a 2011 state court (Duval County, Florida) judgment of conviction for aggravated manslaughter of a child. Respondents have submitted a memorandum in opposition to the Petition. See Respondents' Answer to Petition for Writ of Habeas Corpus (Response; Doc. 17) with exhibits (Resp. Ex.). On June 29, 2016, the Court entered an Order to Show Cause and Notice to Petitioner (Doc. 12), admonishing Ramos regarding her obligations and giving Ramos a time frame in which to submit a reply. Ramos submitted a brief in reply.[1] See Petitioner's Motion to Show Cause (Doc. 23). This case is ripe for review.

_____

[1] See Order (Doc. 26) (construing the Motion to Show Cause as a reply).

## II. Procedural History

On October 7, 2010, the State of Florida charged Ramos with aggravated manslaughter of a child. <u>See</u> Resp. Ex. 1 at 14, Information. Ramos proceeded to a jury trial in August 2011, at the conclusion of which, on August 4, 2011, the jury found her guilty, as charged. <u>See</u> <u>id.</u> at 106, Verdict; Resp. Exs. 3; 4; 5, Transcripts of the Jury Trial (Tr.), at 457-58. On August 4, 2011, the court sentenced Ramos to a term of imprisonment of fifteen years to be followed by seven years of probation. <u>See</u> Resp. Exs. 1 at 110-14, Judgment; 2 at 324.

On direct appeal, Ramos, with the benefit of counsel, filed an initial brief, arguing that the evidence was insufficient to convict her of manslaughter by culpable negligence, and the trial court erred when it denied her motions for judgment of acquittal (ground one). Additionally, she asserted that the trial court erred when it: (a) allowed the State to cross-examine the child victim's father about the wrongful death lawsuit he filed against the apartment complex, and (b) instructed the jury that it could consider whether a witness was offered or received any money, preferred treatment, or other benefit in order to get the witness to testify (ground two). <u>See</u> Resp. Ex. 6. The State filed an answer brief, <u>see</u> Resp. Ex. 7, and Ramos filed a reply brief, <u>see</u> Resp. Ex. 8. On June 14, 2012, the appellate court affirmed Ramos's conviction and sentence in a written opinion, <u>see</u> <u>Ramos v. State</u>,

89 So.3d 1119 (Fla. 1st DCA 2012); Resp. Ex. 9, and the mandate issued on July 2, 2012, see Resp. Ex. 9.

On February 12, 2013, Ramos filed a pro se motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850 (Rule 3.850 motion). See Resp. Ex. 10 at 1-19. In her request for post-conviction relief, she asserted that counsel (Alfonso Perkins) was ineffective because he: failed to object to the State's cross-examination of the child victim's father relating to the wrongful death suit filed against the apartment complex (ground one); failed to depose or call the apartment complex manager as a witness at trial (ground two); and advised her not to testify at trial (ground three). The circuit court struck ground two as facially insufficient, and granted her leave to file an amended motion. See id. at 23-25. Ramos filed an amended Rule 3.850 motion and raised the above-stated grounds. See id. at 26-43. The circuit court directed the State to respond to ground two. See id. at 44-46. The State responded, see id. at 48-90, and Ramos filed a pro se reply, see id. at 91-94. On December 16, 2014, the circuit court denied her Rule 3.850 motion. See id. at 95-141. On April 23, 2015, the appellate court affirmed the court's denial of post-conviction relief per curiam, and the mandate issued on May 19, 2015. See Resp. Ex. 11.

### III. One-Year Limitations Period

The Petition appears to be timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

### IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016), cert. denied, 137 S.Ct. 2245 (2017). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [Ramos's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S.Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011) (quotation marks omitted)). As such, federal habeas review of final state court decisions is "'greatly circumscribed' and 'highly deferential.'" Id. (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011) (quotation marks omitted)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court recently stated:

> [T]he federal court should "look through" the
> unexplained decision to the last related

> state-court decision that does provide a
> relevant rationale. It should then presume
> that the unexplained decision adopted the same
> reasoning.

Wilson v. Sellers, No. 16-6855, 2018 WL 1800370, at *3 (U.S. Apr.
18, 2018). The presumption may be rebutted by showing that the
higher state court's adjudication most likely relied on different
grounds than the lower state court's reasoned decision, such as
persuasive alternative grounds that were briefed or argued to the
higher court or obvious in the record it reviewed. Id. at *3, 7.

If the claim was "adjudicated on the merits" in state court,
§ 2254(d) bars relitigation of the claim unless the state court's
decision (1) "was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by
the Supreme Court of the United States;" or (2) "was based on an
unreasonable determination of the facts in light of the evidence
presented in the State court proceeding." 28 U.S.C. § 2254(d);
Richter, 562 U.S. at 97-98. As the Eleventh Circuit has explained:

> First, § 2254(d)(1) provides for federal
> review for claims of state courts' erroneous
> legal conclusions. As explained by the Supreme
> Court in Williams v. Taylor, 529 U.S. 362, 120
> S. Ct. 1495, 146 L.Ed.2d 389 (2000), §
> 2254(d)(1) consists of two distinct clauses: a
> "contrary to" clause and an "unreasonable
> application" clause. The "contrary to" clause
> allows for relief only "if the state court
> arrives at a conclusion opposite to that
> reached by [the Supreme] Court on a question
> of law or if the state court decides a case
> differently than [the Supreme] Court has on a
> set of materially indistinguishable facts."
> Id. at 413, 120 S. Ct. at 1523 (plurality

opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"[2] Titlow, 571 U.S. at ---, 134 S. Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016), cert. denied, 137 S.Ct. 2298 (2017). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. See Cullen v.

_____

[2] The Eleventh Circuit has described the interaction between § 2254(d)(2) and § 2254(e)(1) as "somewhat murky." Clark v. Att'y Gen., Fla., 821 F.3d 1270, 1286 n.3 (11th Cir. 2016), cert. denied, 137 S.Ct. 1103 (2017).

<u>Pinholster</u>, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1)'s "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." <u>Burt v. Titlow</u>, 134 S.Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" <u>Tharpe</u>, 834 F.3d at 1338 (quoting <u>Richter</u>, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. <u>Richter</u>, 562 U.S. at 102. Thus, to the extent that Ramos's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

## B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. <u>See</u> 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. <u>Castille v. Peoples</u>, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full

opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'"opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S.Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism.

These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[3] <u>supra</u>, at 747–748, 111 S.Ct. 2546; <u>Sykes</u>,[4] <u>supra</u>, at 84–85, 97 S.Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562 U.S. --, --, 131 S.Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S.Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S.Ct. 2546.

<u>Martinez v. Ryan</u>, 132 S.Ct. 1309, 1316 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010).

---

[3] <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

[4] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Carrier</u>, 477 U.S. at 496, 106 S.Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

## C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688, 104 S.Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S.Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S.Ct. 2052.

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

<u>Richter</u>, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward v. Hall</u>, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." <u>Strickland</u>, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." <u>Richter</u>, - U.S. at -, 131 S.Ct. at 788. But "[e]stablishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." <u>Id.</u> (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court

13

> may not disturb a state-court decision denying
> the claim. <u>Richter</u>, - U.S. at -, 131 S.Ct. at
> 788.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014);

<u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009). "In addition to

the deference to counsel's performance mandated by <u>Strickland</u>, the

AEDPA adds another layer of deference--this one to a state court's

decision--when we are considering whether to grant federal habeas

relief from a state court's decision." <u>Rutherford v. Crosby</u>, 385

F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting

<u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>,

559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

As ground one, Ramos asserts that the State's evidence was

insufficient to prove beyond a reasonable doubt that she committed

the aggravated manslaughter of a child, and the trial court erred

in denying her motions for judgment of acquittal in violation of

the Fifth and Fourteenth Amendments. <u>See</u> Petition at 5.

Respondents argue that Ramos did not present this claim as a

federal due process violation on direct appeal, and thus Ramos's

federal due process claim has not been exhausted and therefore is

procedurally barred. <u>See</u> Response at 14-25. On this record, the

Court agrees that the federal due process claim has not been

exhausted and is therefore procedurally barred since Ramos failed

14

to raise the claim in a procedurally correct manner. Ramos has not shown either cause excusing the default or actual prejudice resulting from the bar. Moreover, she has failed to identify any fact warranting the application of the fundamental miscarriage of justice exception.

Even assuming that Ramos's federal due process claim is not procedurally barred, Ramos is not entitled to relief. As previously stated, Ramos argued this issue on direct appeal, <u>see</u> Resp. Exs. 6; 8, and the State filed an Answer Brief, <u>see</u> Resp. Ex. 7. The appellate court ultimately affirmed Ramos's conviction and sentence per curiam in a written opinion as to this issue, stating in pertinent part:

> Jannette Ramos appeals her conviction and sentence for aggravated manslaughter of a child following the drowning death of her infant son in a retention pond close to her apartment. We affirm.
>
> The only issue meriting discussion is whether the totality of Ramos's acts, and failures to act, establish the culpable negligence necessary to sustain her conviction for manslaughter of a child.
>
> Florida imposes upon parents the responsibility to supervise and protect their children who are too young to care for themselves. <u>Machin v. Walgreen Co.</u>, 835 So.2d 284 (Fla. 3d DCA 2002). Here, the legal responsibility for the care of the youngest of Ramos's five children, Nathan Cook, nineteen months old at the time he drowned, fell squarely upon her as his immediate caregiver. Mere negligence in the care of one's young child doesn't necessarily amount to <u>culpable</u> negligence. Things happen in the care of young

children that are unexpected even by
experienced parents; a one-time accident or
misfortune that could not be reasonably
expected to result in serious harm, without
more, does not generally transform a parent
into a culpably negligent criminal. Close
legal questions arise, however, because each
tragic case involves the confluence of an
innocent child's death and a bereaved parent,
whose degree of care, neglect, indifference,
or callous disregard is measured against
societal norms and expectations under the
circumstances. What some judges might deem
culpable negligence by a parent might be
insufficiently egregious to others. See, e.g.,
Edwards v. State, 755 So.2d 443 (Miss. App.
1999) (reversing, over a dissent, the culpable
negligence manslaughter conviction of parents
in the death of their four-year-old who
drowned during [a] camping trip due to
insufficient evidence of culpable negligence).
For this reason, we have reviewed the record
closely to determine whether the jury was
presented with sufficient evidence to believe
Ramos was culpably negligent under the law.

In Florida, culpable negligence is a
"gross and flagrant" violation of a duty of
care that causes injury, a course of conduct
showing "reckless disregard of human life,"
"such wantonness or recklessness" as to equal
the intentional violation of the rights of
others, or an "entire want of care" raising
"the presumption of indifference to
consequences." Preston v. State, 56 So.2d 543,
544 (Fla. 1952); Fla. Std. Jury Instr. (Crim.)
7.7. We evaluate the totality of the
circumstances, as reflected in the record, in
determining whether the facts presented
constitute culpable negligence. Behn v. State,
621 So.2d 534, 537 (Fla. 1st DCA 1993). If the
evidence is sufficient to establish a jury
question regarding whether Ramos was culpably
negligent, we must affirm. State v. Nowlin, 50
So.3d 79, 81 (Fla. 1st DCA 2010) (existence of
a jury question precludes dismissal).

The initial impression of the detective investigating Nathan's death was that it was accidental.[5] But that impression was quickly erased. Several of Ramos's neighbors came forward to tell of many repeated instances of Ramos's failure to supervise Nathan in the months preceding his death. The neighbors were not surprised to learn that Nathan had died; they described the situation as a tragedy waiting to happen.

The testimony regarding Ramos's neglect of Nathan was plentiful. Seven neighbors testified at trial that Nathan would frequently "escape" from Ramos's second floor apartment, crawling down the outside stairs and going near the retention pond, placing the infant at serious risk. Frequently, neighbors saw Nathan descend the stairs from Ramos's apartment by himself, unsupervised. Sometimes Nathan scooted down the stairs unfazed, but neighbors also saw him fall down the stairs and hit his head on the ground on multiple occasions.

One neighbor recounted two separate incidents where Nathan was unsupervised and roaming alone, requiring her to intervene and return him to Ramos's apartment.[6] The first time, the neighbor found Nathan wandering, alone, clothed only in a diaper, beside the retention pond. She took Nathan home to discover the apartment door wide open and Ramos nowhere to be found; only after the neighbor entered the apartment and called out several times did Ramos appear, talking on her mobile phone and wholly unaware that Nathan had been outside. The same neighbor found Nathan near the retention pond a second time and took him home, located on the other side of the

---

5 See Tr. at 295 ("Everything was consistent with our investigation as far as it was a drowning, it was an accident. What started throwing up the red flags was witnesses coming forward as far as the history of not watching the children.").

6 See Tr. at 152-63.

building, where Ramos was simply standing around with other adults.

Another neighbor testified that, five to ten times, she found Nathan alone and unsupervised outside of the apartment, having "bounced down the stairway" from his second floor apartment.[7] Each time she returned Nathan to his home, the front door would be open. Ramos never accepted responsibility, always casting blame on one of her other children for allegedly leaving the door open. Several other witnesses told similar stories: they found Nathan wandering outside, returned him to the apartment with its door open and Ramos oblivious to whether Nathan was missing. Many times Ramos would simply not bother to physically take control of Nathan upon his return; instead, she was preoccupied or too busy to do so – using the computer or talking on the phone. In fact, some neighbors reported that none of Ramos's children, including Nathan, were ever supervised while they played outside.

Yet another neighbor noticed Nathan, while scampering around the pool at the apartment complex, fall into the spa area; a maintenance worker had to rescue him.[8] Ramos did not notice that her child had fallen into the water or appear at the pool until the neighbor reported that Nathan was unsupervised in a risky area.

On the day of Nathan's death, a witness thought he saw three turtles in the pond, but realized his error twenty to forty-five minutes later when he saw a distraught Ramos with Nathan on the shore of the pond where the "turtles" had been.[9] As had occurred so often before, the apartment door was open, Nathan

---

[7] See Tr. at 167, 169.

[8] See Tr. at 210-11.

[9] See Tr. at 221.

had wandered out one last time, and ultimately fell to his death in the retention pond.

Ramos argues that this evidence, as a whole, cannot support a finding that she acted with culpable negligence; she claims her motion for judgment of acquittal should have been granted. We disagree. Applying a de novo standard, we review the evidence in a light most favorable to the State, drawing all reasonable inferences in its favor. Jones v. State, 790 So.2d 1194, 1196-97 (Fla. 1st DCA 2001).

The totality of the circumstances encompasses events both on the day of Nathan's death and at times leading up to that day, if they are relevant to show Ramos was culpably negligent. We have little pause to conclude that the totality of Ramos's conduct was sufficient to create a jury question of whether she was culpably negligent in breaching her duty of care toward Nathan by allowing him repeatedly to wander, unsupervised, near the retention pond. Ramos argues that evidence of her numerous failures to supervise Nathan on many previous occasions cannot establish her culpable negligence on the day of Nathan's death (when she was in the shower, allegedly leaving Nathan's care in the hands of a very young sibling). Had this been a single isolated incident – without the history of Ramos's repeated indifference and inaction as to Nathan's safety – it might fall short of a "gross and flagrant" violation of a duty of care under a culpable negligence standard. Evidence of past neglect and indifference, however, is relevant to show that Ramos acted wantonly and recklessly on a continuous basis, exhibiting a pattern that she was indifferent to the dangerous and ultimately deadly consequences of her actions. The jury was entitled to make the reasonable inference that, after the many previous close calls and despite the many altruistic attempts of neighboring Good Samaritans, Ramos exhibited a degree of behavior that established a "gross and flagrant" violation of a duty of care for

Nathan or, alternatively, an "entire want of care" that created a presumption of indifference to the consequences of her conduct. A single lapse of judgment on a single day may be insufficient to show an "entire want of care," but the evidence here shows a recurring series of increasingly disturbing lapses. This evidence was sufficient to create a jury question, under the totality of the circumstances, that Ramos had engaged in culpable negligence that breached her duty to supervise and protect Nathan.

We also conclude that Ramos's culpable negligence caused Nathan's death, and the exact length of time that Nathan was outside the apartment does not change our conclusion. It is undisputed that he was seen face-down in the water at least twenty minutes before he was retrieved from the pond. While a momentary one-time lapse of judgment by a parent ordinarily would not suffice to establish culpable negligence that is the legal cause of a child's death, Ramos's overall and ongoing pattern of gross indifference does. This lamentable pattern entitled the jury to find that Ramos was culpably negligent and caused Nathan's death. . . .

Ramos, 89 So.3d at 1120-23 (footnotes omitted).

After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Ramos is not entitled to relief on the basis of this claim.

Even assuming that the state court's adjudication of this claim is not entitled to deference, and that the claim presents a sufficiently exhausted issue of federal constitutional dimension,[10] Ramos's claim fails because the State presented sufficient evidence to support Ramos's conviction for aggravated manslaughter of a child. The Due Process Clause of the Fourteenth Amendment requires the State to prove each element of the offense charged beyond a reasonable doubt. Thompson v. Nagle, 118 F.3d 1442, 1448 (11th Cir. 1997) (citing Jackson v. Virginia, 443 U.S. 307, 314 (1979)). In reviewing the sufficiency of the evidence, "this court must presume that conflicting inferences to be drawn from the evidence were resolved by the jury in favor of the State." Thompson, 118 F.3d at 1448 (citing Machin v. Wainwright, 758 F.2d 1431, 1435 (11th Cir. 1985)). Jackson v. Virginia "provides the federal due process benchmark for evidentiary sufficiency in criminal cases." Williams v. Sec'y for Dep't of Corr., 395 F. App'x 524, 525 (11th Cir. 2010) (per curiam) (citing Green v. Nelson, 595 F.3d 1245, 1252-53 (11th Cir. 2010)). In accordance with this authority, the relevant question is whether any rational jury, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the charged offense beyond a reasonable doubt. Jackson, 443 U.S. 319.

---

[10] See Response at 14-25.

Under Florida law, a person who causes the death of any person under the age of eighteen by culpable negligence under Florida Statutes section 827.03 commits the crime of aggravated manslaughter of a child, a felony of the first degree. See Fla. Stat. § 782.07(3) (2012); see Ibeaqwa v. State, 141 So.3d 246, 247 (Fla. 1st DCA 2014). As previously stated, the State charged Ramos with aggravated manslaughter of a child as follows:

> Jannette Ramos on November 5, 2009, in the County of Duval and the State of Florida, did unlawfully, by culpable negligence, cause the death of a person under the age of 18 years old, to-wit: Nathan Cook, while being the child's care giver, by failing to supervise the victim, without lawful justification and under circumstances not constituting excusable homicide or murder, contrary to the provisions of Sections 782.07(3) and 827.03(3), Florida Statutes.

Resp. Ex. 1 at 14, Information. At trial, the court instructed the jury as follows:

> Jannette Ramos, the defendant in this case, has been accused of the crime of aggravated manslaughter.
>
> To prove the crime of manslaughter, the state must prove the following two elements beyond a reasonable doubt:
>
> First, that Nathan Cook is dead.
>
> And the second, the death of Nathan Cook was caused by the culpable negligence of Jannette Ramos.
>
> However, the defendant cannot be guilty of manslaughter if the killing was either justifiable or excusable homicide.

The killing of a human being is justifiable homicide and lawful if necessarily done while resisting an attempt to murder or commit a felony upon the defendant or to commit a felony in any dwelling house in which the defendant was at the time of the killing.

The killing of a human being is excusable and, therefore, lawful under any one of the following three circumstances:

First, when the killing is committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent or when the killing occurs by accident and misfortune in the heat of passion upon any sudden and sufficient provocation or when the killing is committed by accident and misfortune resulting from a sudden combat if a dangerous weapon is not used and the killing is not done in a cruel or unusual manner.

Next I'm going to define for you culpable negligence. Each of us ha[s] a duty to act reasonably toward others. If there is a violation of that duty without any conscious intention to harm, that violation is negligence. But culpable negligence is more than a failure to use ordinary care toward others. In order for negligence to be culpable, it must be gross and flagrant. Culpable negligence is a course of conduct showing reckless disregard of human life or of the safety of persons exposed to its dangers -- to its dangerous effects, or such an entire want of care as to raise a presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard for the safety and welfare of the public, or such an indifference to the rights of others as is equivalent to an intentional violation of such rights.

The negligent act or omission must have been committed with an utter disregard for the safety of others. Culpable negligence is consciously doing an act or following a course

of conduct that the defendant must have known or reasonably should have known was likely to cause death or great bodily injury.

If you find the defendant guilty of manslaughter, you must then determine whether the state has further proved beyond a reasonable doubt that Nathan Cook was a child whose death was caused by the negligent -- by the neglect, excuse me, of Jannette Ramos, a caregiver.

A "child" means any person under the age of 18 years.

A "caregiver" means a parent, adult household member, or other person responsible for a child's welfare.

"Neglect of a child" means a caregiver's failure or omission to provide a child with the care, supervision, and services necessary to maintain a child's physical and mental health, including but not limited to food, nutrition, clothing, shelter, supervision, medicine and medical services that a prudent person would consider essential for the well-being of the child.

Repeated conduct or a single incident or omission by a caregiver that results in or could reasonably be expected to result in a substantial risk of death of a child may be considered in determining neglect.

Tr. at 434-37.

After viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found Ramos committed the aggravated manslaughter of a child. Thus, viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to support the conviction for aggravated manslaughter of a child. Competent evidence of the elements of the

offense was introduced at trial, and no due process violation occurred. The jury was entitled to believe the State witnesses' accounts of what transpired on the day in question as well as the time period leading up to the tragedy. Given the record, the trial court did not err in denying Ramos's motions for judgment of acquittal;[11] the evidence was sufficient to justify the court submitting the case to the jury; and the evidence was sufficient to support the conviction for aggravated manslaughter of a child. Therefore, Ramos is not entitled to habeas relief as to ground one.

## B. Ground Two

As ground two, Ramos asserts that the trial court erred when it: (a) allowed the State to cross-examine the child victim's father (Robert Cook) about the wrongful death lawsuit he filed against the apartment complex, and (b) instructed the jury that it could consider whether a witness was offered or received any money, preferred treatment, or other benefit in order to get the witness to testify, thus violating Ramos's federal due process right. See Petition at 6. Respondents argue that Ramos did not present this claim as a federal due process violation on direct appeal, and thus Ramos's federal due process claim has not been exhausted and therefore is procedurally barred. See Response at 26-29. On this record, the Court agrees that the federal due process claim has not been exhausted and is therefore procedurally barred since Ramos

---

[11] See Tr. at 301, 378, 390.

failed to raise the claim in a procedurally correct manner. Ramos has not shown either cause excusing the default or actual prejudice resulting from the bar. Moreover, she has failed to identify any fact warranting the application of the fundamental miscarriage of justice exception.

Even assuming that Ramos's federal due process claim is not procedurally barred, Ramos is not entitled to relief. As previously stated, Ramos argued this issue on direct appeal, see Resp. Exs. 6; 8; the State filed an Answer Brief, see Resp. Ex. 7; and the appellate court ultimately affirmed Ramos's conviction and sentence per curiam in a written opinion,[12] see Ramos, 89 So.3d 1119.

In its appellate brief, the State addressed the claim on the merits, see Resp. Ex. 7 at 20-24, and therefore, the appellate court may have affirmed Ramos's conviction based on the State's argument. If the appellate court addressed the merits, the state court's adjudication of this claim is entitled to deference under AEDPA. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence

---

[12] The appellate court did not explain its rationale underlying its affirmance as to the issue. See Ramos, 89 So.3d at 1120.

26

presented in the state court proceedings. Accordingly, Ramos is not entitled to relief on the basis of this claim.

Even assuming that the state court's adjudication of this claim is not entitled to deference, and that the claim presents a sufficiently exhausted issue of federal constitutional dimension,[13] Ramos's claim is without merit. Notably, in denying Ramos's Rule 3.850 motion as to her ineffectiveness claim relating to counsel's failure to object to the cross-examination of Robert Cook, the circuit court stated in pertinent part:

> Defendant alleges that counsel was ineffective for failing to object to the State's cross-examination of Robert Cook ("Cook") regarding his pending civil suit against the apartment complex where the instant offense took place. Defendant asserts that this testimony was irrelevant and inadmissible.
>
> "Where a witness has filed a civil suit against the defendant or a third party (arising out of the criminal incident), inquiry into this is relevant to the witness' motivation in testifying at the criminal trial." Graves v. State, 937 So.2d 1286, 1290 (Fla. 4th DCA 2006) (quoting Nelson v. State, 704 So.2d 752, 753 (Fla. 5th DCA 1998)); Payne v. State, 541 So.2d 699, 700 (Fla. 1st DCA 1989). Such testimony should only be excluded if "it is unjust to the witness and uncalled for by the circumstances." Graves, 937 So.2d at 1290 (citation omitted.)
>
> In this case, Cook, the victim's father, testified for the defense. On cross-examination, the State asked Cook about the pending civil suit he filed against the

---

[13]   See Response at 26-29.

apartment complex where the victim drowned in
a retention pond. (Ex. D at 332-35.) The State
asked Cook what the purpose of the civil suit
was and whether he brought a civil suit
against Defendant. (Ex. D at 333-35.)[14] This
questioning was relevant and admissible in
order to determine Cook's motivation for
testifying. See Graves, 937 So.2d at 1290;
Payne, 541 So.2d at 700. Moreover, the
testimony was not unjust or uncalled for under
the circumstances. In fact, in Ground Two of
the instant Motion, Defendant states that if
she had not been misadvised about her right to
testify, she would have testified as to the
alleged negligence of the apartment complex in
that she requested to have the locks fixed on
her door and that they never fixed them.
During this contested cross-examination, and
on redirect when defense counsel asked
follow-up questions regarding the contested
cross-examination, Cook testified that the
apartment complex's failure to repair the door
locks was one of the underlying reasons of his
civil suit against the apartment complex. (Ex.
D at 334, 336-37.) Defendant cannot, in one
ground say that certain testimony is harmful,
and in another ground within the same Motion,
state that she wished that evidence had been
brought out at trial. This Court finds that
the cross-examination was proper, and thus,
counsel cannot be held ineffective for failing
to object to it. See Hitchcock, 991 So.2d 337,
360 (Fla. 2008) ("Counsel cannot be deemed
ineffective for failing to make a meritless
objection.") (citation omitted).

Assuming arguendo counsel was deficient,
Defendant fails to satisfy the prejudice prong
of Strickland. Defense counsel's argument
during Defendant's trial was that Defendant
took reasonable actions to protect her child,
but that this was an unfortunate accident that
happened because Defendant's eldest daughter

---

[14]     Notably, the court overruled counsel's objection to the
State's cross-examination of Cook relating to the lawsuit's purpose
as beyond the scope of direct examination. See Tr. at 333.

> left the top door lock unlocked, and the other
> lock was broken, despite Defendant's requests
> for repair. Cook's contested statements on
> cross support the alleged fault of the
> apartment complex. As stated above, Defendant
> avers in Ground Two that she wanted the
> apartment complex manager to testify at trial
> to the fact that the apartment complex did not
> fix her door lock, despite her many requests.
> Therefore, this Court finds that this
> testimony did not prejudice Defendant's case,
> but rather, aided in presenting testimony that
> Defendant herself wanted presented. Defendant
> is, thus, not entitled to relief on this
> claim.

Resp. Ex. 10 at 96-98.

The trial court did not err when it permitted the State to cross-examine Cook as to the potential benefits he could receive from his civil lawsuit. See Tr. at 332-35. Moreover, the court did not err when it instructed the jury on weighing the evidence as follows:

> It is up to you to decide what evidence
> is reliable. You should use your common sense
> in deciding which is the best evidence and
> which evidence should not be relied upon in
> considering your verdict. You may find some of
> the evidence not reliable or less reliable
> than other evidence.
>
> You should also consider how the
> witnesses acted, as well as what they said.
> Some additional things to consider are:
>
> Did the witness seem to have an
> opportunity to see and know the things about
> which the witness testified?
>
> Did the witness seem to have an accurate
> memory?

Was the witness honest and straightforward in answering the attorneys' questions?

Did the witness have some interest in how the case should be decided?

Does the witness' testimony agree with the other testimony and other evidence on the case?

**Has the witness been offered or received any money, preferred treatment, or other benefit in order to get the witness to testify?**

Has any pressure or threat been used against the witness that affected the truth of the witness' testimony?

Did the witness at some other time make a statement that is inconsistent with the testimony he or she gave in court?

You may rely upon your own conclusion about the witness. A juror may believe or disbelieve all or any part of the testimony of any witness.

Tr. at 442-44 (emphasis added). Accordingly, on this record, Ramos is not entitled to federal habeas relief on ground two.

### C. Ground Three

As ground three, Ramos asserts that counsel was ineffective because he advised her not to testify at trial. <u>See</u> Petition at 8. She raised the claim in her amended Rule 3.850 motion in state court. <u>See</u> Resp. Ex. 10 at 40-42. The court ultimately denied the post-conviction motion with respect to the claim, stating in pertinent part:

Defendant alleges that counsel was
ineffective for misadvising Defendant
regarding her right to testify. Defendant
asserts that she wished to testify and counsel
told her she was not allowed. Defendant avers
that had counsel informed her of her right to
testify, she would have chosen to testify to
rebut allegedly untruthful testimony.

At the end of Defendant's case,[15] this
Court asked whether Defendant was going to
testify, and counsel responded that she would
not. This Court then entered into a colloquy
with Defendant personally to assure that she
made this decision knowingly and voluntarily.
(Ex. D at 375-77.) This Court explained, and
Defendant acknowledged on the record, that
Defendant had the right to remain silent, but
also had the right to testify on her behalf.
(Ex. D at 376-77.) Defendant also acknowledged
she understood that while she may get advice
on whether to testify by her attorneys, it was
ultimately her decision and she was "the final
decisionmaker" on whether to testify on her
own behalf. (Ex. D at 377.) This colloquy
shows that Defendant was fully aware of her
right to testify and her right to make that
decision, and individually made the decision
to remain silent and not become a witness.
Therefore, Defendant cannot now go behind her
sworn statements to allege that she would have
testified had she known her rights. <u>Stano v.
State</u>, 520 So.2d 278, 280 (Fla. 1988); <u>Bir v.
State</u>, 493 So.2d 55, 56 (Fla. 1st DCA 1986);
<u>Dean v. State</u>, 580 So.2d 808, 810 (Fla.
3d DCA 1991). Accordingly, Ground Three is
denied.

<u>Id.</u> at 100-01. On Ramos's appeal, the appellate court affirmed the

trial court's denial of post-conviction relief per curiam. <u>See</u>

Resp. Ex. 11.

---

[15] <u>See</u> Tr. at 362-63, 374-77.

To the extent that the state appellate court affirmed the trial court's denial on the merits,[16] the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of the claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Ramos is not entitled to relief on the basis of the claim.

Moreover, even assuming the state appellate court's adjudication of the claim is not entitled to deference, Ramos's claim nevertheless is without merit. In evaluating the performance prong of the <u>Strickland</u> ineffectiveness inquiry, there is a strong presumption in favor of competence. <u>See</u> <u>Anderson v. Sec'y, Fla. Dep't of Corr.</u>, 752 F.3d 881, 904 (11th Cir. 2014). The presumption that counsel's performance was reasonable is even stronger when, as in this case, defense counsel Mr. Perkins is an experienced criminal defense attorney.[17] The inquiry is "whether, in light of

---

[16] In looking through the appellate court's affirmance to the trial court's "relevant rationale," this Court presumes that the appellate court "adopted the same reasoning." <u>Wilson</u>, 2018 WL 1800370, at *3.

[17] "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is

all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. "[H]indsight is discounted by pegging adequacy to 'counsel's perspective at the time' . . . and by giving a 'heavy measure of deference to counsel's judgments.'" Rompilla v. Beard, 545 U.S. 374, 381 (2005). Thus, Ramos must establish that no competent attorney would have taken the action that counsel, here, chose.

Notably, the test for ineffectiveness is neither whether counsel could have done more nor whether the best criminal defense attorneys might have done more; in retrospect, one may always identify shortcomings. Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (stating that "perfection is not the standard of effective assistance") (quotations omitted). Instead, the test is whether what counsel did was within the wide range of reasonable professional assistance. Ward, 592 F.3d at 1164 (quotations and citation omitted); Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007) ("The question is whether some reasonable lawyer at the trial could have acted as defense counsel acted in the trial at issue and not what 'most good lawyers' would have done.") (citation omitted).

---

even stronger." Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000); see Williams v. Head, 185 F.3d 1223, 1229 (11th Cir. 1999). Mr. Perkins was admitted to the Florida Bar in 1990. See http://www.floridabar.org. At the time of Ramos's 2011 trial, Perkins was an experienced trial lawyer.

At trial, defense counsel initially advised the court that Ramos had not made a final decision as to whether she would testify or not. <u>See</u> Tr. at 362-63. The next morning, the following colloquy ensured.

> [DEFENSE COUNSEL]: Your Honor, at this time Ms. Ramos has decided that she does not want to testify at this point. I did talk to her about that last night and again this morning to make sure that there were no changes in that. She would be the last witness that we would call.
>
> . . . .
>
> THE COURT: All right I need to speak to Ms. Ramos.
>
> And for the record the interpreter's name, please?
>
> THE INTERPRETER: Adrianna Gonzalez.
>
> THE COURT: Ms. Gonzalez, if you will raise your right hand. Do you solemnly swear you will accurately interpret all conversations for this defendant so help you God?
>
> THE INTERPRETER: Yes I do.
>
> THE COURT: Ms. Ramos, I know you speak English, so hopefully you will understand me. If you don't understand something I say, just let me know and we can have Ms. Gonzale[z] try and help you out.
>
> Your attorney, Mr. Perkins, has indicated that you are going to exercise your right to remain silent and not become a witness in this case; is that correct?
>
> [RAMOS]: Yes, sir.

THE COURT: And, obviously, you understand you have that right under the United States Constitution?

[RAMOS]: Yes, sir.

THE COURT: You also can become a witness if you wanted to. If you did, then you would be treated like any other witness and you would take the stand like they did and you would have to take the oath. You'd be examined and cross-examined and just be treated as any other witness was treated that you have seen during the course of the trial. You understand that is an option? You don't have too, but it is an option.

[RAMOS]: Yes, sir.

THE COURT: All right, and then I gather that you have had conversations with your attorneys, maybe family members or whatever to make the decision whether or not to testify or not to testify, correct?

[RAMOS]: Yes, sir.

THE COURT: And do you recognize and understand that ultimately while you get advice from attorneys and you get advice from family members, it is your decision, your individual decision, you're the final decisionmaker on whether to become a witness or not. Do you understand that?

[RAMOS]: Yes, sir.

THE COURT: And sometimes there are strategies involved about whether to take the stand or not take the stand. Sometimes defendants don't want to because they don't think they could do it; it is just too scary for them. Other times defendants want to take the stand. Their lawyers may say I don't think it's a good idea; let's just stand on what we have done so far. And, you know, so different things can be considered. But at the end of

the day it is your choice whether to become a witness or not. Do you understand?

[RAMOS]: Yes, sir.

THE COURT: All right. And you have decided to exercise your constitutional right to remain silent and not become a witness, correct?

[RAMOS]: Correct.

Tr. at 374-77.

On this record, Ramos has failed to carry her burden of showing that her counsel's representation fell outside that range of reasonably professional assistance. Even assuming arguendo deficient performance by defense counsel, Ramos has not shown any resulting prejudice. She has not shown that a reasonable probability exists that the outcome of the case would have been different if counsel had advised her in the manner she suggests. Her ineffectiveness claim is without merit since she has shown neither deficient performance nor resulting prejudice. Accordingly, Ramos is not entitled to federal habeas relief on ground three.

## VII. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Ramos seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Ramos "must demonstrate that reasonable

jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. <u>See Slack</u>, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id.</u> Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1. The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.     The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.     If Ramos appeals the denial of the Petition, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.     The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 24th day of April, 2018.

MARCIA MORALES HOWARD
United States District Judge

sc 4/24
c:
Jannette Ramos, FDOC #J45308
Counsel of Record